IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DALE E. McCORMICK,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>SUSAN HADL, MICHAEL MONROE, and  )<br>DENNIS JOHNSTON,  )<br>)<br>Defendants.  )<br>_____)  | Case No.<br>03-2630-KHV |

## MEMORANDUM AND ORDER

Dale E. McCormick brings this civil rights action under 42 U.S.C. § 1983, alleging that police officers for the City of Lawrence, Kansas deprived him of various constitutional rights and committed several torts when they illegally searched his automobile. Specifically, plaintiff claims that Susan Hadl, Michael Monroe and Dennis Johnston violated his rights under the First, Fourth, Sixth and Fourteenth Amendments, invaded his privacy and illegally trespassed on his property when they searched his car while placing him under arrest on December 12, 2001. The case is before the Court on the Motion for Summary Judgment (Doc. #36) which defendants filed March 18, 2005. Defendants assert that as a matter of law, they are entitled to qualified immunity because (1) the search was a valid search incident to arrest; (2) the objects of the search were within plain view; and/or (3) the search fell under the automobile exception to the warrant requirement of the Fourth Amendment. Alternatively, defendants argue that they did not violate any rights which were clearly established. They also claim discretionary immunity under the Kansas Tort Claims Act. For the reasons stated below, the

1

Court overrules defendants' motion in part and sustains it in part. The Court grants qualified immunity as to plaintiff's First and Sixth Amendment claims and otherwise denies defendants' motion.

In response to defendants' motion, plaintiff filed a Motion for Partial Summary Judgment (Doc. #42) on May 27, 2005. Plaintiff failed to comply with the dispositive motion deadline, which was March 18, 2005. The Court therefore overrules plaintiff's motion as untimely.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). Maverick Paper Co. v. Omaha Paper Co., Inc., 18 F. Supp. 2d 1232, 1234-35 (D. Kan. 1998).

**Factual Background**

For purposes of defendants' motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

Plaintiff, a 34-year-old male, is a self-described civil rights activist. Although he lived in Lawrence, Kansas during the period relevant to this lawsuit, he is now incarcerated at the Hutchinson Correctional Facility in Hutchinson, Kansas.

Plaintiff was a student at Washburn University in Topeka, Kansas in 1997 when he met Yasmin Haque. They began a "strange but . . . intimate relationship," and were "close intimate friends for a number of years." By mid-1999, however, based on complaints by Haque, the State of Kansas charged plaintiff in the District Court of Shawnee County, Kansas with felony stalking, two counts of criminal trespass and multiple counts of telephone harassment.

By January 2001, both plaintiff and Haque had independently relocated to Lawrence. On the morning of November 23, 2001, plaintiff followed Haque to her home, claiming that he had an affidavit for her to sign. Haque refused to sign the document, slammed the door and called 911. Officer Andy Tubbs responded to Haque's 911 call. Haque told him that in the past, plaintiff had harassed her. Tubbs advised Haque that he would look for plaintiff and that if he found him, he would instruct him not to return to the premises.

Tubbs explained the situation to Officer Scott Chamberlain, who was sitting in a patrol car in front of Haque's house. The officers then spotted plaintiff down the street, and Chamberlain stopped plaintiff's car. Tubbs maintains that he warned plaintiff that he could be arrested for trespass if he returned to Haque's property. Plaintiff denies any such warning.

On November 28, 2001, plaintiff telephoned Haque at her place of employment. He left a message that if she did not sign the affidavit, he would have to take her deposition. On November 30, Haque found a letter from plaintiff in her mailbox. The letter stated, among other things, "I've checked up on you a bit recently . . . and had other people check up on you too." Based on the letter, Haque suspected that plaintiff had possession of her journal, which was missing.

In the early morning hours of December 1, 2001, plaintiff went to Haque's home to "check on her welfare." Plaintiff had read Haque's journal and other documents which he had recovered from her trash, and

4

he was concerned that she was suicidal. Haque called 911 and reported plaintiff's visit. She also reported that her journal had been stolen from her house the previous day.

Later that day, on her car, Haque found a copy of a letter which plaintiff had previously written. The letter was annotated with handwritten underscoring, punctuation and margin notes.

On December 4, 2001, Haque found envelopes from plaintiff on her car and in her mailbox. She ignored them. On December 6, she discovered a letter on her porch with bold-faced type across the top: "I found your old journal in your trash." The next day, on her front porch, Haque found copies of two pages from her journal with annotations by plaintiff. On her car, Haque found another copy of a page from the journal. Plaintiff called Haque twice that day at work. He left her a message, telling her to talk to him or he would contact someone about the contents of her journal.

On December 10, 2001, plaintiff left Haque another voice mail message, stating that he would contact SRS about her "suicidal tendencies" unless she contacted him no later than noon on December 11. Haque then found another copy of a page from her journal on her car. Plaintiff's handwriting, scrawled across the face of it, said "Stop being a liar! Stop being a fake! Stop using people! Instead, DEAL WITH the things that make you suicidal! DEAL WITH Yasmon [sic]!" Later that day, Haque's mother told Haque that plaintiff had e-mailed her and other relatives and friends.

On December 11, 2001, Haque contacted the police to follow up on her recent complaints. She relayed to Officer Tim Meyer what had occurred over the previous several days, and Meyer asked for a formal, written statement. Later that day, Officer Brian Jimenez discussed with Haque in detail the events which had transpired since December 1.

As of December 12, 2001, the City of Lawrence had an unrelated outstanding warrant for plaintiff's

5

arrest. Plaintiff had gone to the municipal court to pay the fine, but he was too late for the morning docket and court personnel told him that he did not need to worry about the warrant if he appeared in court the following morning.

Plaintiff drove straight from municipal court to Haque's house to get an answer to his ultimatum and check on her welfare. When plaintiff approached Haque's door, she was on the phone with Sergeant Mark Warren, who had been talking to Meyer and had called Haque about making a statement. Haque told Warren that at that moment, plaintiff was on her front porch. Warren relayed that information to Meyer, who contacted dispatch to send officers to Haque's address. Meyer then left for Haque's house, as well.

Before officers arrived, plaintiff got into a physical fight with Haque and a male friend of hers. Haque hit plaintiff with a baseball bat several times in the leg, and her friend threw a wicker chair at plaintiff. After hitting plaintiff with the bat, Haque retreated inside. Plaintiff stopped to pet Haque's dog in the front yard, returned the dog to the front porch, and then walked into the street to return to his car. From the time plaintiff knocked on Haque's door until the time she whacked him with the baseball bat, the whole "ironic, bizarre" incident lasted approximately two or three minutes.

Meyer then pulled up to the house. Meyer recalls that plaintiff was entering his car when he arrived. Plaintiff maintains that he was in the middle of the street, flagging down Meyer, about 20 feet north of his car, which is the closest he got to his car in the presence of any officer.

As plaintiff and Meyer talked, Susan Hadl arrived. Meyer briefed her on what had just happened. From the briefing, Hadl learned that Meyer was investigating plaintiff for stalking Haque and burglarizing her residence. She also learned that plaintiff had been leaving copies from Haque's journal at the residence and on Haque's car. Meyer told Hadl that when he had arrived, plaintiff was either completely or partially inside

6

his vehicle. Another officer present at the scene, Ken Farrar, told Hadl that he thought plaintiff had an outstanding arrest warrant. Farrar left the scene shortly after Hadl arrived. After he departed, Officers Michael Monroe and Dennis Johnston pulled up and parked their patrol car about 40 feet from plaintiff's car.

Hadl ran a warrant check, which revealed the warrant for plaintiff. Plaintiff told Hadl that a court employee had told him he could take care of it the following morning. Hadl then conferred with the municipal court and confirmed that the warrant was valid.

Hadl informed Monroe and Johnston of the valid arrest warrant, and Monroe and Johnston arrested and handcuffed plaintiff. They told him that he was being arrested on the municipal warrant. Later, at the jail, they advised him he was also being charged with criminal trespass.

From outside plaintiff's car, Hadl could see three groups of paper. Based on the presence of the papers, the information which she had received that morning, and past experience with plaintiff carrying a handgun in his glovebox, Hadl decided to search plaintiff's car. At the time, plaintiff was handcuffed in Monroe and Johnston's patrol car. The officers removed him from the patrol car, took his car keys from his front pants pocket, returned him to the patrol car and strapped a seatbelt on him. Hadl unlocked plaintiff's car and returned the keys to him. Plaintiff objected to the search.

Hadl searched the interior, the glovebox and the trunk of plaintiff's car, but found nothing of evidentiary value. The three stacks of paper consisted of (1) a clipboard containing confidential documents relating to the Lawrence Radical Coalition and another political group; (2) legal research; and (3) a stack of folders containing work product material pertaining to pending litigation. Monroe and Johnston did not assist Hadl in the search, but neither did they intervene. During the search, they drove plaintiff from the scene.

Since the search of his car, plaintiff has been afraid to "freely create and use confidential political

materials, has felt violated in his personal security and sanctity, feels wrath and anger every time he remembers or thinks about how defendants willfully disregarded [his] objections to their illegal conduct, felt oppressed and has otherwise suffered mental anguish."

## Analysis

**I. Fourth Amendment Claim**

Plaintiff claims that the car search violated the Fourth Amendment. Defendants deny that the search violated the Fourth Amendment and assert that they are entitled to summary judgment on their defense of qualified immunity.[1]

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The affirmative defense of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001) (citation omitted). Once the defense has been raised, plaintiff has the burden to establish both that defendants' actions violated a constitutional or statutory right and that the right was "clearly established" at the time of the relevant conduct. Medina v. Cram, 252 F.3d 1124,

---

[1] The Court recognizes that plaintiff's claims against Hadl differ from his claims against Monroe and Johnston. Plaintiff claims that Hadl's affirmative action in conducting the search violated the Fourth Amendment. Plaintiff claims that Monroe and Johnston violated the Fourth Amendment by failing to intervene. Because the Court ultimately determines that Hadl is not entitled to qualified immunity, Monroe and Johnston are not entitled to qualified immunity for failing to intervene. Clearly established law provided that a police officer must intervene to prevent a violation of constitutional rights. See, e.g., Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996). Monroe and Johnston do not offer evidence that they were unaware that Hadl lacked a legitimate reason for searching plaintiff's car without a warrant. See Martin v. Bd. of County Comm'rs, 909 F.2d 402, 405 (10th Cir. 1990) (defendant must show actions objectively reasonable in light of information possessed at time).

1128 (10th Cir. 2001). Ordinarily, to demonstrate that a law was clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992); see Anderson v. Creighton, 483 U.S. 635, 640 (1987) (right clearly established if contours of right sufficiently clear that reasonable official would understand what he is doing violates that right). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 194-95 (2001).

If plaintiff satisfies this two-part burden, defendants must demonstrate that as a matter of law, their actions were objectively reasonable in light of the law and the information which they possessed at the time. See Martin, 909 F.2d at 405. If defendants make such a showing of objective reasonableness, they are entitled to summary judgment unless plaintiff can demonstrate a factual dispute which is relevant to defendants' immunity claim. See id.

**A. Search Incident to Arrest**

Defendants first assert that the search of plaintiff's car did not violate the Fourth Amendment because it was a lawful search incident to arrest. The Court determines, however, that genuine issues of material fact preclude summary judgment on this issue.

Law enforcement officers must ordinarily obtain a warrant, based on probable cause, before conducting a search. See New York v. Belton, 453 U.S. 454, 457 (1981). The Supreme Court has recognized an exception to this rule where officers conduct a warrantless search incident to a lawful arrest. See Chimel v. California, 395 U.S. 752, 762-63 (1969). In the context of a lawful arrest of an occupant or recent occupant

9

of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle and examine the contents of any containers found within the passenger compartment as a contemporaneous incident of arrest. Belton, 453 U.S. at 460; see United States v. Franco, 981 F.2d 470, 473 (10th Cir. 1992) (discussing Belton in context of recent occupant). In Franco, the Tenth Circuit held that the search of defendant's automobile was incident to his arrest because defendant "exercised control over his vehicle and its contents at the time of the arrest and during the commission of the offense, and was its immediate occupant." 981 F.2d at 473. Belton is based on the rationale that the search prevents the arrestee from reaching for weapons or destructible evidence. See id. at 472.

In 2004, the Supreme Court further defined when officers may search an automobile incident to a lawful arrest. See Thornton v. United States, 541 U.S. 615, 124 S. Ct. 2127 (2004). In Thornton, an officer followed defendant and determined that his license tags had been issued for a car model other than what he was driving. See id. at 2129. Before the officer had an opportunity to pull him over, however, defendant parked and got out of his car. See id. The officer saw defendant get out of the car, then parked his own car, accosted defendant and requested his driver's license. See id. Because defendant appeared nervous, the officer asked if he could pat him down. See id. In defendant's pockets, the officer found bags of marijuana and cocaine. See id. The officer handcuffed defendant, told him that he was under arrest and placed him in the back seat of the patrol car. See id. The officer then searched defendant's car and found a .9 millimeter handgun under the driver's seat. See id.

The Fourth Circuit Court of Appeals noted defendant's concession that he was in "close proximity, both temporally and spatially," to his vehicle. It therefore found that the car was within his immediate control and that the search was reasonable under Belton. See id. at 2130. The Supreme Court affirmed. It first noted

10

that Belton did not depend on whether the arrestee got out of the vehicle at the officer's direction or whether the officer initiated contact while defendant remained in the car. Id. at 2131. The Supreme Court reasoned that the stress and uncertainty of an arrest "is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle." Id. The Supreme Court emphasized that Belton applies to both "occupants" and "recent occupants" of a vehicle. It therefore concluded that even though not all contraband in the passenger compartment may be readily accessible to a recent occupant, "[t]he need for a clear rule . . . justifies the sort of generalization which Belton enunciated." Id. at 2132. The Supreme Court held that "[o]nce an officer determines that there is probable cause to make an arrest [of a recent occupant of a vehicle], it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." Id. It further held that "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle such as petitioner was here, officers may search that vehicle incident to the arrest."[2] Id. An arrestee's status as a "recent occupant" may turn on his temporal and spatial relationship to the car at the time of the arrest and search. Id. at 2131.

Whether plaintiff in this case was a "recent occupant" of his vehicle is clearly at issue. Plaintiff admits that his whole encounter with Haque lasted only two or three minutes from the time he knocked on her door to the time she hit him with the baseball bat. The record does not reveal how much time it took plaintiff to walk to Haque's door or how much time he remained in the yard, petting the dog, before walking into the street and flagging down Meyer. Also, it appears that no officer ever saw plaintiff in his car. Viewed in the light most

---

[2] The dissent in Thornton correctly noted that the decision does not say "how recent is recent, or how close is close." Id. at 2140.

11

favorable to plaintiff, the evidence indicates that plaintiff was not a "recent occupant" of his car and that the officers did not know whether he was. See United States v. Mighty, No. Crim.A.04-54 GMS, 2005 WL 950627, at *11 (D. Del. Apr. 26, 2005) (defendant not recent occupant when officer never saw him in car). But cf. Maiale v. Youse, No. 03-5450, 2004 WL 1925004, at *1, 6 (E.D. Pa. Aug. 27, 2004) (plaintiff recent occupant where other witnesses observed him in car, even though officers did not). As far as the officers knew, plaintiff could have been at Haque's house for hours, or even left his car overnight, allowing ample time for someone to tamper with the contents of his car. Cf. State v. Kelly, 963 S.W.2d 866, 870 (Tex. Ct. App. 1998) (defendant who was arrested at distance from car not recent occupant where he had been out of car and inside house for ten to 15 minutes); State v. McLendon, 490 So. 2d 1308, 1310 (Fla. Ct. App. 1986) (where mere minutes lapsed between exit from vehicle and arrest, affording no opportunity for intervention and tampering with evidence, search pursuant to lawful arrest).

Plaintiff's proximity to his car is also problematic for defendants' claim of qualified immunity. At various times, plaintiff was 20 feet from his vehicle, 40 feet from his vehicle, and even riding away from his vehicle in handcuffs. Although Thornton discussed defendant's close proximity to his vehicle, it did not address whether the recent occupant must be close to the vehicle (1) when the officer initiates contact, (2) when the officer arrests defendant or (3) when the officer searches the car. At the time of the search in Thornton, however, defendant was handcuffed in the patrol car. 124 S. Ct. at 2129. The close proximity requirement did not require defendant to be close to the vehicle during the search. But cf. United States v. Lugo, 978 F.2d 631, 635 (10th Cir. 1992) (Belton did not permit search when defendant no longer at scene but handcuffed and

transported in patrol car).³  In Thornton, defendant was apparently close to his car when he was arrested, see 124 S. Ct. at 2132 n.2, but the Supreme Court ruling did not turn on that fact.  In this case, the record reveals a genuine issue of fact as to how far from his car plaintiff was at any time.  Therefore the Court cannot rule as a matter of law that plaintiff's spatial and temporal proximity alleviated the need to procure a warrant before searching the car.

Furthermore, under any version of the facts, the search of the trunk was not incident to a lawful arrest. The trunk of the vehicle is not within the scope of a search incident to arrest.  United States v. Wright, 932 F.2d 868, 878 (10th Cir. 1991) (citation omitted).  Although an officer can search the passenger compartment incident to a lawful arrest, this right does not extend to the trunk because the trunk is not within reach of the arrestee.  United States v. Blaze, 143 F.3d 585, 591 n.8 (10th Cir. 1998).

Because plaintiff alleges a constitutional violation, the Court must determine whether the constitutional right was clearly established in light of the specific context of this case.  See Saucier, 533 U.S. at 201-02.  In December of 2001, clearly established law provided that when a police officer lawfully arrested the occupant of a vehicle, she could contemporaneously search the passenger compartment incident to the arrest.  See Belton, 453 U.S. at 460.  In the Tenth Circuit, the law clearly established that a search was impermissible when conducted while defendant was handcuffed and  transported in the back of the patrol car.  See Lugo, 978 F.2d at 635.  A search was also impermissible when nothing in the car was within defendant's "grab space."  See United States v. Edwards, 242 F.3d 928, 938 (10th Cir. 2001).  Thornton has changed the landscape of

---

³ Both the Tenth Circuit and the District of Kansas have questioned the continuing validity of Lugo in light of Thornton.  See United States v. Sumrall, 115 Fed. Appx. 22, 26 (10th Cir. 2004); United States v. Robinson, No. 04-40107-01-RDR, 2005 WL 946524, at *3 (D. Kan. Feb. 3, 2005).

Fourth Amendment jurisprudence since the time of the search in this case, but the law during the relevant time period was clearly established.

Because plaintiff has satisfied his two-part burden, defendants must show that as a matter of law, their actions were objectively reasonable in light of the law and the information which they possessed at the time. See Martin, 909 F.2d at 405. Defendants have not offered any affidavits or otherwise explained how their actions were objectively reasonable in light of the law and the information which they possessed at the time, and the Court therefore denies summary judgment on this issue.

**B. Plain View Doctrine**[4]

Defendants argue that even if the search of plaintiff's car was not a valid search incident to arrest, they are entitled to qualified immunity because plaintiff left potentially incriminating evidence in plain view in his car. When evidence is in plain view, no "search" occurs, and the Fourth Amendment prohibition on unreasonable searches is not implicated. See Horton v. California, 496 U.S. 128, 133-34 (1990). As an exception to the warrant requirement, however, the plain view doctrine exempts *seizures*, not *searches*. Id. Under the plain view exception, a police officer may properly seize evidence of a crime without a warrant if (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent, i.e. the officer had probable cause to believe that the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself. United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999); United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). Under

---

[4] Plaintiff asks the Court to consider Rule 11 sanctions for defendants' claim that they did not need a warrant under the plain view doctrine. The Court declines plaintiff's invitation to impose sanctions because plaintiff has not followed proper procedures for requesting sanctions. See Fed. R. Civ. P. 11(c)(1)(A).

the plain view doctrine, a seizing officer need not "know" or have an "unduly high degree of certainty" that the evidence is incriminatory. Texas v. Brown, 460 U.S. 730, 741 (1983); see United States v. Castorena-Jaime, 285 F.3d 916, 924 (10th Cir. 2002). All that is required is a "practical, nontechnical probability that incriminating evidence is involved." Brown, 460 U.S. at 742; see Castorena-Jaime, 285 F.3d at 924.

At best, this case strains the plain view doctrine. A seizure is not at issue here. Hadl viewed papers from outside the car, without reading their content, then entered the car to take a closer look. If she could not "plainly view" the content from outside the car, however, she did not have a right to reposition herself inside the car to get a better view. See Horton, 496 U.S. at 136 (officer cannot violate Fourth Amendment to arrive at place from which object can be plainly viewed). Outside the car, Hadl was lawfully in a position to view the papers. If the incriminatory nature of the papers was evident from the outset, Hadl could have seized the papers. Here, even on closer inspection, the papers lacked evidentiary value. Moreover, the search of the trunk could not be justified by the plain view doctrine, as the contents of the trunk were not in plain view. Viewing the evidence in the light most favorable to plaintiff, he has met his burden of showing a constitutional violation.

The Court must turn, then, to whether the law was clearly established. At all relevant times, the law was well settled that an officer may not rely on the plain view doctrine when the incriminating nature of evidence is not immediately apparent. See, e.g., Carey, 172 F.3d at 1272; Sanchez, 89 F.3d at 719. In this case, a reasonable officer would have understood that searching the car based on seeing generic "papers" in the car, without more, violates the owner's Fourth Amendment rights. Defendants have not shown that their actions were objectively reasonable in light of the law and the information which they possessed at the time. See Martin, 909 F.2d at 405.

**C. Automobile Exception**

Finally, defendants contend that they are entitled to qualified immunity because as a matter of law, the warrantless search was justified under the "automobile exception" to the Fourth Amendment. The Supreme Court has recognized an "automobile exception" which has no exigency requirement. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). If a car is readily mobile and officers have probable cause to believe that it contains contraband, the Fourth Amendment permits police to search the vehicle without a warrant. Id.; see Maryland v. Dyson, 527 U.S. 465, 466-67 (1999). The issue here is whether defendants had probable cause to believe that plaintiff's car contained contraband and whether the car was "readily mobile." Most courts do not dwell on the factual question whether the vehicle was readily mobile, see United States v. Mercado, 307 F.3d 1226, 1229 (10th Cir. 2002) (citation omitted), and neither will this Court,[5] because the record reveals genuine issues of material fact whether Hadl had probable cause to search the car.

The record is murky as to how much information Hadl had at the time she performed the search. Although the record indicates that the officers shared information, exactly what information they shared is unclear. That information is key in determining whether Hadl had probable cause to search the car. Moreover, it had been two days since plaintiff left pages of Haque's journal on her car. Therefore the Court cannot hold as a matter of law that Hadl had probable cause to suspect that plaintiff's car would contain pages from

---

[5] The Supreme Court has implied that a car's mobility is not always relevant. See Mercado, 307 F.3d at 1228 (citing Michigan v. Thomas, 458 U.S. 259, 261 (1982)). Furthermore, courts have not been friendly to arguments that cars have lost their inherent mobility. The argument generally is not successful unless an objective observer would conclude that the vehicle is being used as a residence, see United States v. Ludwig, 10 F.3d 1523, 1529 (10th Cir. 1993) (citing California v. Carney, 471 U.S. 386, 392 (1985)), or the vehicle is dismantled on private property, see Lavicky v. Burnett, 758 F.2d 468, 475 (10th Cir. 1985). In Mercado, where a car had mechanical problems but could be fixed in a matter of hours, the Tenth Circuit held that the car was readily mobile. 307 F.3d at 1229.

Haque's journal. Furthermore, the Court notes that defendants did not arrest plaintiff on charges related to the journal; they arrested him initially on the outstanding warrant and later added trespassing charges.

On this record, the Court cannot hold as a matter of law that defendants had probable cause to search plaintiff's car. The law on the automobile exception was clearly established. See, e.g., Dyson, 527 U.S. at 466-67; Labron, 518 U.S. at 940. Defendants have not offered evidence that their actions were objectively reasonable in light of the law and the information which they possessed at the time. See Martin, 909 F.2d at 405. On this record, defendants are not entitled to qualified immunity as a matter of law.

## II. First and Sixth Amendment Claims

The basis for plaintiff's First and Sixth Amendment claims is unclear. Plaintiff alleges that he was deprived of the right to be free from an unreasonable search, but the First and Sixth Amendments do not protect this right. Moreover, the Court questions whether the pretrial order preserves First and Sixth Amendment claims. Although the pretrial order includes them in the statement of the nature of the case,[6] plaintiff's factual contentions and theories of recovery do not mention the First and Sixth Amendments. The pretrial order controls the course of the case. Miller v. Pfizer Inc. (Roerig Div.), 196 F. Supp. 2d 1095, 1123 n.92 (D. Kan. 2002).

Even if the pretrial order is liberally construed to include claims under the First and Sixth Amendments, plaintiff has failed to meet his burden of showing that clearly established law under the First and Sixth Amendments prohibited a search of his car (or the papers in his car). The Court grants defendants qualified

---

[6] In the statement of the nature of the case, the pretrial order alleges as follows: "[P]laintiff alleges that, on December 12, 2001, the defendant police officers illegally searched his automobile in violation of rights secured to him by the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution." Pretrial Order (Doc. #49 ) filed June 21, 2005, ¶ 2.

immunity on both claims.

## III.  State Law Claims

Plaintiff brings common law claims for invasion of privacy and trespass.  He alleges that defendants entered an area which he had a right to keep private, without his consent and after he explicitly told them not to.  Defendants contend that they are entitled to immunity under the Kansas Tort Claims Act because they were performing a discretionary function at the time of the search.[7]  See Kan. Stat. Ann. § 75-6104(e); Hopkins v. State, 702 P.2d 311, 318 (Kan. 1985) (citation omitted) ("Discretion implies the exercise of discriminating judgment within the bounds of reason.").  Government officials are not liable for damages resulting from "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty," even when the discretion is abused.  Kan. Stat. Ann. § 75-6104(e).  Discretionary immunity is not uncircumscribed, however; "only negligent or wrongful acts or omissions . . . are excepted from liability by 75-6104, while acts or omissions involving more than lack of ordinary care and diligence are not."  Hopkins v. State, 702 P.2d 311, 318-19 (Kan. 1985).

The record reveals a genuine issue of material fact whether defendants are entitled to discretionary function immunity.  Taking plaintiff's version of the facts as true, a trier of fact could find that defendants' acts involved more than lack of ordinary care.  Summary judgment is denied on this issue.

---

[7] In the event that the Court finds that defendants are entitled to discretionary immunity, plaintiff asks the Court to certify the following question to the Kansas Supreme Court: "Does the Kansas Tort Claims Act violate § 18 of the Kansas Bill of Rights?"  Section 18 of the Kansas Bill of Rights provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."  Plaintiff claims that the Kansas Tort Claims Act, by offering immunity for tortuous acts, violates the mandate that all persons shall have remedy for injuries.  Because the Court denies discretionary immunity at this time, it is unnecessary to consider whether to certify the question to the Kansas Supreme Court.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment (Doc. #36) which defendants filed March 18, 2005 be and hereby is **OVERRULED in part and SUSTAINED in part**. Plaintiff's First and Sixth Amendment claims are dismissed with prejudice. The remainder of the claims will proceed to trial.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Partial Summary Judgment (Doc. #42), filed May 27, 2005, be and hereby is **OVERRULED** as untimely.

Dated this 28th day of June, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge